We'll hear Cosmetic Plus Group v. Gowen. Good morning. Good morning. May it please the Court, Howard File on behalf of the appellants. At the outset, I'd like to mention that we agree with the finding of the Bankruptcy Court. Are you reserving rebuttal time? I missed the initial calendar call. Two minutes, perhaps. Don, go ahead. Thank you. At the outset, I would point out that we agree with the determination of the Bankruptcy Court to the extent that it determined that a new trust was created when the Dreier firm wired to the TBF firm into their escrow account our client's settlement proceeds from the AIG lawsuit that they brought in their own adversary proceeding. Where we do disagree with the Bankruptcy Court and the District Court is the fact that they determined that upon creation of that trust it was a preference that was voidable under 547B. And I would submit to the Court that it was the trustee's burden, not my burden to establish whether that property that was stolen from my client was actually the property of the bankruptcy estate or not. Isn't the problem for you the inability to trace the $350,000 to the money that ultimately winds up in the Dreier account? That is apparently, as the law exists today, yes, it's my burden. And part of what I would ask that this Court consider as a policy consideration is that that rule in this unique situation where a client's funds are stolen from an attorney's escrow account needs to be modified or relaxed. Because you have a situation unlike the other people who had money in the Dreier account who were either where he stole from his operating account, from his Ponzi scheme investors' monies. He transacted business with those people. In our situation, a trust was created the minute Judge Beatty ordered that he hold those monies in escrow on behalf of his client. In effect, you are saying that the client fund ought to be treated as if it had a degree of a security interest that elevates it above other creditors. Absolutely. While I understand the spirit behind the suggestion, what's the law supporting it? I'm sorry? I understand the spirit behind that suggestion, and one might imagine a world in which, as a matter of policy, somebody tiered the interest in that way. But is there any law that allows us to simply say that because it's a client's funds as opposed to a different type of creditor, that's the prioritization we ought to use? Frankly, I think it's time to create that law, because the minute the client's monies go into an attorney's escrow account, it's being held in trust for the client. The Code of Ethics under 1.14 creates a statutory trust the minute those funds are deposited into the attorney's escrow account. Here you had a court order from Judge Beatty back in February of 2008 which directed the Dreyer firm to hold these monies in trust on behalf of its clients. My sole burden should have been limited to showing that monies were actually deposited into Dreyer's escrow account, when it happened, and how much was deposited, which we clearly were able to do. In this case, there actually turned out to be some funds, whether you could trace them back or not. There were some funds that ended up in the TBF account. But your argument would seem to suggest that if money is deposited into an attorney's escrow account and is commingled and then stolen by the lawyer, that even if there's nothing left in any escrow account, every person whose money was in the escrow account has a secured claim. Only for the client's funds that were stolen, because the client's funds were, in fact, a trust created at the outset from the moment it was deposited. The other funds that were commingled, such as what they— But if there was no money left at all in the escrow fund at the time that the law firm goes belly up, you're saying that if any funds had been deposited, subject to a trust, into the escrow account, those funds enjoy a security interest. As against all general creditors. The facts that Your Honor is raising is not actually the facts of our case— That's true. That's why. —where there were monies in the account. That's why the client is a hypothetical, because it's not the facts of this case. But you're arguing for a principle. And the principle, what seems to me, would impress with a security interest the funds that are in the general pot and are no longer in any escrow account at all. Well, except in this case, again, the courts already determined, the bankruptcy court, which was not appealed or challenged and is now the law of the case, that a new trust was created. A new trust was created on December 4th, two weeks before Dreyer's bankruptcy action commenced. At that point in time, once a new trust was created, it contained the client's funds. The fact that it may have come from other commingled funds, I'm asking this Court to relax that obligation to demonstrate— The problem is then the funds come from—they don't come from Dreyer. They come from all the people Dreyer owes money. They're the ones who are paying to your client. And that's troublesome, too. To take money—well, all this horrible stuff is going on. Take money, put it aside, and say, Oh, by the way, these people don't get it, but you get it. No, I agree with you, Your Honor. And the obligation of the trustee is to marshal and preserve assets for the bankruptcy estate. And in this regard, where you had a commingling, according to the appellee, of operating account monies, Ponzi scheme monies, and client funds, yes, you separate out the Ponzi scheme monies and the operating account monies, which clearly or arguably belong to the debtor or the debtor's estate, as opposed to client escrow funds, which never from the outset, if they can be demonstrated that they were deposited for escrow purposes on behalf of the client, never, ever belonged to the attorney who stole those monies. Until he stole them. I mean, the problem is that he took the money and put it somewhere else, and that's true of, imagine, the Ponzi scheme money, too. Except he transacted business—those creditors, he transacted business with directly. They voluntarily dealt with this gentleman. Our client was compelled by court order to have their settlement funds deposited into his escrow account. Why was it his escrow account that they had it deposited? Because that was Judge Beatty's. Was it because Dreyer was counsel? No, actually, at the beginning of the CPG bankruptcy, it was TBF. Okay, then tell me why it went into the Dreyer funds. Because during the course of the CPG lawsuit against AIG, within their own adversary proceeding in their Chapter 11 action, TBF was initially their bankruptcy attorneys. Six years later, they merged TBF with Dreyer, and at the point that I settled the adversary proceeding in CBG's case, TBF submitted an order to Judge Beatty that directed the settlement proceeds to be placed into Dreyer's account because he now was the so-called attorney of record. His trial was now part of Dreyer. Correct. Correct. Which, by the way, was not even known to the client, which is not even relevant. It isn't as though there was no connection between Dreyer or post-trial and your client. There was a connection. We're talking about your client's lawyer. Our client's lawyer merged with the Dreyer firm. Or became Dreyer. Correct. But it isn't as though there was no relationship between them. You seem to be saying the bankruptcy judge had it transferred just to Dreyer, with whom she had no connection. No, she did. It was her lawyer. It became her lawyer's. Well, because the paper submitted by TBF to Judge Beatty for the purpose of having the settlement approved indicated that they had now merged with Dreyer, and therefore the court directed that Dreyer hold these monies on behalf of its client, CPG. Is this a matter of two partners from TBF leaving and becoming partners of Dreyer, or is this a matter of the original firm actually merging into Dreyer? The mechanics I'm not that familiar with as to the merger. Because it looks as though money was taken from the Dreyer escrow account and put into the account of the firm in which the lawyers representing your client had originally been partners. TBF continued to maintain their own escrow account even after they merged with the Dreyer firm. It was just simply a separate account, but it was all part of the . . . I see. In other words, they kept their own clients and they continued to do business, but they were financially integrated? To a certain extent, because when Judge Beatty, in October of 2008, directed that these settlement funds now be distributed first to pay administration expenses and then to the trustee and finally to CPTG's secure creditors, they actually paid themselves first out of their own escrow account, TBF's account. They paid the trustee out of the TBF account. There was a balance of about $11,000 left over, which they paid over to CPTG. But the other $350,000, they then requested be sent back to them from Dreyer, which Dreyer did do at a time that there was money in the escrow account. You've reserved a couple of minutes for rebuttal. We'll hear you then. Thank you. Thank you. Good morning. May it please the Court, Brendan Scott on behalf of Sheila Gowan in her capacity as the post-confirmation plan administrator and the appellee here. We think it's important to note at the outset there are two separate and distinct transactions here. There's the March 2008 payment of settlement proceeds into the Dreyer LLP5966 account. By no later than August of 2008, that deposit had been dissipated in full on the account balance. Come back and tell me why was it paid into that account rather than a Troub account? It was paid into that account because Dreyer LLP was bankruptcy counsel for Cosmetics Plus at that time. It's clearly noted in the settlement agreement that Dreyer LLP was in fact counsel. It was not only a relationship. It was counsel to the debtor, Cosmetics Plus, in its bankruptcy case. And it became the counsel because people from Troub had moved to Dreyer. I believe it was a full merger of the Troub Bonnequist Fox firm into Dreyer. Certainly, the partners in charge, Stephen Fox and Paul Troub, became partners in Dreyer LLP. And as I said, that deposit was fully dissipated as of August 2008 at the latest and no longer traceable. Then there's the second transfer, which is the transfer in December of 2008 of funds from the 5966 account, which is a commingled account, into the Troub Bonnequist Fox account. We think the trustee met her burden showing that the funds that came out of the 5966 account were property of the estate. Help me, please, because you say that the ‑‑ tell me about the account in which the funds were dissipated. Did that particular account remain without funds thenceforth and forever, or was it filled up again? The funds continued to come in and go out. Mark Dreyer used that account for any number of purposes and stipulated in the record that the account, both at the time the money came in and when the money went out, was a commingled account, contained proceeds from Mark Dreyer's note fraud scheme, contained legitimate Dreyer operating funds. Was it from that account that the money was paid to the Troub account, the 400? It was. The money came into the 5966 account, was dissipated, and then a payment went out of the 5966 account in December 2008. Supposing that Dreyer had not declared bankruptcy until more than three months after the $350,000 goes out. Taken under those circumstances, notwithstanding the lack of traceability, CPG then would have presumptively been able to hold on to the $350,000. I think that's a fair assumption because, you know, based on the bankruptcy court's finding that a new trust was created in December 2008, if the bankruptcy filing had been more than 90 days after that, I think the estate would not have had a manner to attack that transfer and to avoid that transfer. So I think that that's right. But those, of course, are not the facts here. The transfer took place during the 90-day preference period at a time when Dreyer LLP was presumptively insolvent. The transfer was made clearly to pay an antecedent debt, which arose at the time the funds were transferred in and when they were stolen. So all of the elements of the preferential transfer under the code, under Section 547 of the code, are met. And the bankruptcy court found as much. We know whether there were other competing client claimants to the money in the 5966 account as of the time of the Dreyer bankruptcy, or is CPG really the only client claimant to the funds? No, there were other client claimants. In fact, one of the client claimants similarly made a claim, was reclassified, and took an appeal through the district court and then to the Second Circuit. Ultimately, that was settled. But there are other claimants, and that is the problem here, and that is why I think the law is such that in a situation like this where there is a commingled account and you're unable to determine whose money, which money belongs to who, it becomes the burden of the claimant to trace its funds. But pursuing your adversary's theory, let's suppose the amount of client claimants was less than the amount in the 5966 account, even though other forms of creditors' claims would have pushed us well over the size of the amount in the 5966. Why isn't it a rational way to think about this that the clients ought to come first and then Ponzi scheme victims and other creditors should be somewhere below clients? Well, I think that, I guess, is something along the lines of a replenishment theory, such that when funds came into the account, these various trust funds were replenished. But I think that the intent of the dryer firm, I think, is important to that determination. And here at trial, the appellants did not put in any evidence with regard to what the intent of the dryer firm was when funds were coming in. The bank statements are in the record. The bank statements show numerous transfers from hedge funds that were part of the fraud schemes, numerous transfers from clients, payments out to hedge funds, payments out to clients, payments to general creditors. So I think you would need to have a finding that the dryer firm's intent was to replenish the trust. But if the trustee had said, look, as among the money I've been able to harness in the 5966 account, I'm making the election that as among clients, general creditors, and fraud victims, clients come first, and then once we've paid them all out 100 cents on the dollar, everyone else has paid rateably, would that have been within the trustee's discretion? I don't think it is within the trustee's discretion because I think these creditors were similarly situated. Once these funds were gone and untraceable, it becomes a commingled pool. All general unsecured creditors under the code are treated similarly. There's a strong assumption under the code that if you are a general unsecured creditor, you are treated the same. There are not different levels of unsecured creditors. Either you have a claim that's higher in priority than an unsecured claim or you're an unsecured claimant. And all of the creditors here, including the note fraud scheme victims, general creditors, meaning trade creditors, utilities and such, and the clients were general unsecured creditors. They did not have ‑‑ there was no basis in law for them to have a priority claim from the commingled funds that were held in 5966 unless they were able to trace those funds to the exclusion of other creditors. Is there no fund established by the state bar to make whole clients whose funds are deposited into a lawyer's escrow account and then stolen by the lawyer? There is a fund. I'm not sure whether the appellants pursued a claim with respect to that fund or not. Is that the IOLA fund? I'm not sure of the name of it, but the state does have a, I believe it is the IOLA fund, but I'm not quite certain what that is. Do lawyers contribute to it? Yes. But I don't know whether the appellants made a claim with respect to that or not. I don't believe it's relevant here to the facts of this case and the analysis of whether or not this was a preferential transfer. Does the record reflect why Dreyer, which apparently was able to pay CPG the $350,000 for some period after March 14th, didn't do so such that all this time passed, the account is drained, it's replenished, and ultimately isn't paid out until December? Any visibility? Well, the bank statements in the record do show that at the end of March, the ending balance of that account was $58,000. So in truth, most of, you know, we don't know what money went out, but at the very best case scenario for the appellants here, $58,000 was in the account at the end of March. So their trust had already been broken at the end of March, except to the extent of $58,000. Why the funds were not transferred out of the Dreyer firm, I think, is because the settlement agreement and the order of approval required the funds to be held in that account, pending further of the court, I believe is my understanding, and not until October of 2008 when Judge Beatty issued another order directing what should happen with those funds. Could the funds be released from that account? So just to touch on again, I believe that the trustee did meet her burden of showing that these funds were property in the estate because in a commingled account, the burden is shifted to the appellants. The appellant made no effort to trace their funds, and we believe the bankruptcy court properly found that this ---- Your position would be impossible to trace the funds. We believe it would be futile because the funds ---- If the account went to zero, the line of investigation would have been ended. That's correct, Your Honor. That is our position. Thank you. Your Honor, very briefly in response to Your Honor's question to counsel, we did exhaust all our other avenues of recovery, including malpractice claims against both TBF and, well, including the grievance committee. So this is our court of last resort, frankly. And in response to Your Honor's question to counsel, which was part of the malpractice claim that was brought against TBF, is that the last order of Judge Beatty of October 30 required distribution of the settlement proceeds within 14 days. Even if it had been done within one day, you'd still be having the result of it having been paid within 90 days of the bankruptcy filing, so you'd analytically be in the same situation as you are now. Yeah, except, again, I say that it's the trustee's burden to prove that these monies constituted funds of the estate and not the client. And although we stipulated to the bank account records going into the record, I didn't stipulate as to whether or how much of those monies were operating account monies, Ponzi scheme monies, or client account monies. I wouldn't even be privy to that information, and I thought that would have been their burden to prove at the time of the hearing on the preference issue, which they did not. But in finality, I did not discuss the constructive trust theories that I believe should apply in this instance, which are fraud rectifying. And the whole purpose of constructive trust is to impose or provide some remedy to a person who's been injured by a fiduciary. Clearly here, Dreyer was a fiduciary holding monies in escrow for its client that it stole. The burden should not be on me to have to trace commingled funds. Somehow, that obligation should be relaxed by this court. You have a situation where the client's been victimized twice. First by the theft of his funds by the attorney, and second by the fact that now this person whose monies were stolen gets maybe six to eight cents on a dollar, whereas the bulk of their monies go to people who were not remotely connected to the 9-11 terrorist attacks that resulted in them getting their settlement. Thank you. Thank you, Judge. We'll reserve the decision. That's the last case on calendar. Please adjourn court. Court is adjourned.